## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **DEMARIO BETHANY,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )   **Case No. 19-CV-0273-TCK-CDL** |
| | ) |
| **SCOTT CROW,** | ) |
| | ) |
| **Respondent.** | ) |

## OPINION AND ORDER

Petitioner Demario Bethany, an Oklahoma prisoner appearing *pro se*,[1] petitions for a writ of habeas corpus under 28 U.S.C. § 2254, claiming he is in custody in violation of the Constitution or other federal law pursuant to the judgment entered against him in the District Court of Tulsa County, Case No. CF-2015-388.  Having considered Bethany's petition (Dkt. 1), Respondent Scott Crow's response in opposition to the petition (Dkt. 9), records from state court proceedings (Dkts. 9-1 through 9-5, 10, 11), and applicable law, the Court denies the petition.

## *BACKGROUND*

Courtney Parks died from multiple gunshot wounds on December 29, 2014, near the Plaza Hills Apartment complex in East Tulsa.  Dkt. 10-7, Tr. Trial vol. 4, 652-53 [33-34], 707-09 [88-90].[2]  Following an investigation, the State charged Bethany with first-degree felony murder, in violation of Okla. Stat. tit. 21, §§ 701(B); attempted robbery with a firearm, in violation of Okla.

---

[1]  Because Bethany appears without counsel, the Court liberally construes his pleadings. *James v. Wadas*, 724 F.3d 1312, 1315 (10th Cir. 2013).  But, in applying the rule of liberal construction, the Court does not take on the role of Bethany's advocate. *Id.*

[2]  When citing to transcripts of state court proceedings, the Court refers to original page numbers and, in brackets, refers to the CM/ECF header page numbers, to the extent the page numbers differ.  Citations to all other documents refer only to the CM/ECF header pagination.

Stat. tit. 21, § 801, for attempting to rob Parks before shooting him; feloniously pointing a firearm, in violation of Okla. Stat. tit. 21, § 1289.16, for pointing a firearm at Bethany's girlfriend, Amy Sessions, so that she would lure Parks to the apartment complex before the robbery; and possession of a firearm after former conviction of a felony, in violation of Okla. Stat. tit. 21, § 1283, for possessing the gun Bethany used to shoot Park and intimidate Sessions.   Dkt. 10-1, Original Record (O.R.) vol. 1, 122-23; Dkt. 9-3, *State v. Bethany*, No. F-2017-505 (Okla. Crim. App. 2018) (unpublished) (OCCA Op.) 1, 3.   Bethany's case proceeded to a jury trial in November 2016.   Dkt. 10-4, Tr. Trial vol. 1, 1.   The jury found Bethany guilty of felony murder, attempted robbery with a firearm, and possession of a firearm after former conviction of a felony, and recommended a life sentence for each conviction.   Dkt. 9-3, OCCA Op. 1.   The jury found Bethany not guilty of feloniously pointing a firearm.   *Id.*   The trial court vacated the conviction for attempted robbery with a firearm because it merged with the felony-murder conviction, adopted the jury's sentencing recommendations as to counts one and four, and ordered that Bethany serve the two life sentences consecutively.   *Id.* at 1-2.

Represented by counsel, Bethany filed a direct appeal in the Oklahoma Court of Criminal Appeals, asserting seven claims.   Dkt. 9-3, OCCA Op. 2.   The OCCA rejected each claim on the merits and affirmed Bethany's convictions and sentences.   *Id.* at 3-8.

In the instant petition, Bethany raises the same claims he presented to the OCCA on direct appeal.   He claims:   (1) the prosecutor used peremptory challenges in a discriminatory manner during jury selection, in violation of the Fourteenth Amendment's equal protection clause (claim one); (2) the State failed to present sufficient evidence to prove his guilt beyond a reasonable doubt, in violation of the Fourteenth Amendment's due process clause (claims two and three); (3) the trial court did not adequately define "attempt" through jury instructions, in violation of the Fourteenth

2

Amendment's due process clause (claim four); (4) two of his convictions violate Oklahoma's statutory prohibition against double punishment (claim five); (5) trial counsel did not provide constitutionally adequate representation, thus depriving him of his Sixth Amendment right to counsel (claim six); and (6) the trial court imposed an excessive sentence (claim seven).  Dkt. 1, Pet. 5-23.  Respondent Scott Crow urges the Court to deny the petition, arguing that the OCCA reasonably rejected those claims that implicate federal law and that the claims that implicate only state law are not properly raised in this habeas action.

### DISCUSSION

A federal court may grant habeas relief to a person in custody under a state-court judgment only if that person shows that he or she is "in custody in violation of the Constitution, laws, or treaties of the United States."  28 U.S.C. § 2254(a).  The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) strictly limits a court's discretion to grant federal habeas relief.  As relevant in this case, a federal habeas court shall not grant relief as to any federal claims that were adjudicated on the merits in state court unless the petitioner first shows that the state court's adjudication of the claim resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1),[3] or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

Section 2254(d)'s standards are demanding.  When the state court "'identifies the correct

---

[3] As used in § 2254(d)(1), the phrase "clearly established Federal law" means "the governing legal principle or principles" stated by "the holdings" of the Supreme Court's "decisions as of the time of the relevant state-court decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

governing legal principle' in existence at the time" of its decision, the only question under § 2254(d)(1) is "whether the decision 'unreasonably applies that principle to the facts of the prisoner's case.'" *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (quoting *Williams*, 529 U.S. at 413). To establish that the decision resulted from an objectively unreasonable application of the law, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Under § 2254(d)(2), a petitioner must show that the state court decision rests on an unreasonable determination of the facts. But the reasonableness of a state court's factual determination also is measured by *Richter*'s fairminded-disagreement standard. *Dunn v. Madison*, 138 S. Ct. 9, 12 (2017). And the Supreme Court has emphasized that, "if [*Richter*'s] rule means anything, it is that a federal court must carefully consider all the reasons and evidence supporting the state court's decision" and that the federal court may not disturb the state court's decision "without identifying—let alone rebutting—all of the justifications" that may support that decision.[4] *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (*per curiam*).

With these standards in mind, the Court turns to Bethany's claims.

## I.    Discriminatory use of peremptory challenges

Bethany claims the prosecutor, Julie Doss, impermissibly used the State's peremptory challenges in a discriminatory manner to excuse four prospective jurors who are described as

---

[4] In addition, when § 2254(d) applies, the federal habeas court's review is limited to the same record that was presented in state court. *Pinholster*, 563 U.S. at 185. And a federal court must presume the correctness of the state court's factual findings unless the petitioner rebuts that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

minorities—R.S., T.M., E.F.,[5] and T.J.—in violation of the Fourteenth Amendment, as interpreted

in *Batson v. Kentucky*, 476 U.S. 79 (1986).  Dkt. 1, Pet. 5-6; Dkt. 9-1, Appellant's Br. 18-19.

## A.    Clearly established federal law

Under clearly established federal law, "a State may not discriminate on the basis of race

when exercising peremptory challenges against prospective jurors in a criminal trial."  *Flowers v.*

*Mississippi*, 139 S. Ct. 2228, 2234 (2019) (citing *Batson*).[6]  Evaluation of a *Batson* challenge,

occurs first, as it must, in the trial court, and that court applies a three-step burden-shifting

framework:

> First, the trial court must determine whether the defendant has made a prima
> facie showing that the prosecutor exercised a peremptory challenge on the basis of
> race.  Second, if the showing is made, the burden shifts to the prosecutor to present
> a race-neutral explanation for striking the juror in question.  Although the
> prosecutor must present a comprehensible reason, "[t]he second step of this process
> does not demand an explanation that is persuasive, or even plausible"; so long as
> the reason is not inherently discriminatory, it suffices.  Third, the court must then
> determine whether the defendant has carried his burden of proving purposeful
> discrimination.  This final step involves evaluating "the persuasiveness of the
> justification" proffered by the prosecutor, but "the ultimate burden of persuasion
> regarding racial motivation rests with, and never shifts from, the opponent of the
> strike."

*Rice v. Collins*, 546 U.S. 333, 338 (2006) (internal citations omitted) (quoting *Purkett v. Elem*, 514

U.S. 765, 767-68 (1995) (*per curiam*)).  On direct review, an appellate court applies this same

framework and, like the trial court, must consider "all of the circumstances that bear upon the issue

of racial animosity" in determining whether the opponent of the strike has met his or her burden,

---

[5] The parties and portions of the record of state court proceedings sometimes refer to E.F. either as F.P. or E.F.P.  The Court uses the initials that correspond with the names of the prospective jurors as listed in the original record.  Dkt. 10-1, O.R. vol. 1, 194.

[6] Because the Supreme Court decided *Flowers* after the OCCA issued its decision in Bethany's direct appeal, the Court cites *Flowers* only to the extent the *Flowers* Court discussed Supreme Court precedent that was clearly established as of 2018, when the OCCA issued its decision.  *Andrade*, 538 U.S. at 71.

at step three, to show purposeful discrimination.  *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). Nonetheless, an appellate court must give a trial court's factual "findings great deference" and sustain the trial court's "ruling on the issue of discriminatory intent . . . unless it is clearly erroneous."  *Flowers*, 139 S. Ct. at 2244; *see also Snyder*, 552 U.S. at 477 (discussing the trial court's "pivotal role" in discerning discriminatory intent at *Batson*'s third step which requires the trial court to make credibility determinations based on the trial court's "firsthand observations" of the demeanor of both the prosecutor and prospective jurors).  On habeas review, a federal court also evaluates a *Batson* challenge within the same framework, but the federal court must give even greater deference to a state court's factual findings regarding a *Batson* claim.  *See Collins*, 546 U.S. at 343-44 (Breyer, J., concurring) (discussing *Batson* and noting that "considerations of federalism require federal habeas courts to show yet further deference to state-court judgments").  A federal habeas court's review of a *Batson* claim is guided by both § 2254(d)(2)'s requirement that the state-court's factual determination must be unreasonable in light of the evidence presented in state court and § 2254(e)(1)'s presumption that a state court's factual findings are presumed correct absent clear and convincing evidence to the contrary.  *Grant*, 886 F.3d at 949-50.

In short, trial courts are uniquely qualified to make the factual findings based on credibility determinations required by the *Batson* framework, appellate courts "will, and must, grant the trial courts considerable leeway in applying *Batson*" and affirm their factual findings unless those findings are clearly erroneous, and federal habeas courts considering a *Batson* claim must permit a "state-court factual determination [to] stand unless [that determination is] 'unreasonable.'" *Collins*, 546 U.S. 333, 343-44 (Breyer, J., concurring).

### B.      Additional facts

At trial, Bethany objected to the State's use of strikes to excuse R.S., T.M. E.F., and T.J.

Doss used the State's first peremptory strike to excuse R.S., and Bethany's attorney, Gregg Graves, objected, noting that the panel of prospective jurors began with only six African-American panelists and two were excused by agreement, leaving only four as prospective jurors. Dkt. 10-5, Tr. Trial vol. 2, 321 [259].  Graves thus asked the trial court to have the prosecutor provide a racially-neutral reason for the strike.  *Id.*  The trial court stated that because R.S. "is the first one that the State has asked to be removed" there was no "systematic effort by the State to exclude African Americans at this time," but that Doss could provide a race-neutral reason "if [she] want[ed] to."  *Id.* at 322 [260].  Doss did so, under protest, during the following colloquy:

Ms. Doss:  Well, Judge, certainly.  I do not believe it's even appropriate at this time to even raise a *Batson* challenge because there has been no showing that there's a pattern - -

[Trial court]:  Right.

Ms. Doss:  - - by the State of Oklahoma.

However, [R.S.] has got - - he had made an indication when he found out that someone on the panel had a relative that had been in prison for an extended number of years; seemed shocked and upset by that.

The biggest reason though, Your Honor, is that he has three cousins that are in prison right now for a robbery.  And so we think, even if Your Honor believes that we have to give a race-neutral reason, those are certainly race-neutral reasons.

But, again, there's been no pattern shown here.  We haven't asked to have any African Americans taken off this jury until [R.S.].

[Trial court]:  Any response to that, Mr. Graves?

Mr. Graves:  The - - I would just simply point out that, number one, there are a number of individuals that have family members in prison.  [R.S.] was very clear that he had very little to do with these individuals. There were people with much closer family members in prison who had contact with them or friends in prison who they had contact with.  A number of these were  - - as a matter of fact, almost all of these were not African Americans.

Without casting aspersions, it would appear that if - - it concerns me that the State can avoid systemic - - or the appearance of systemic

on probably who is [the] best African American juror we have just by putting them first.  But I don't believe that she has stated race-neutral reasons.  That applies to a number of Caucasian jurors as well.

Ms. Doss:      And, Judge, I don't have to show that there's a reason that other people do not have.  All I'm required to show - - again, it's my position that I'm not even required in this situation to provide a race-neutral reason because *Batson* has not been established.  There has been no showing there's been any kind of showing of systemic removal of African Americans by the State of Oklahoma.

But it should be noted, since the argument is being made, that I believe [R.S.] is the only individual that has family members in prison for robbery.  And that is one of the counts that we have here.  It's the basis for our Murder in the First Degree-Felony Murder charge.  So clearly it's a race-neutral reason that - - again, we don't believe we should have to give one at this point.

[Trial court]:   Your challenge will be denied.

Dkt. 10-5, Tr. Trial vol. 2, 322-24 [260-62].

Doss used the State's fourth peremptory challenge to excuse T.M., and Graves objected.

*Id.* at 326 [264].  When the trial court asked for Doss's response, Doss stated:

First of all, her - - she has a cousin that's in prison for murder.  She originally said that life and LWOP were too high of punishments to be considered in a murder.  When I originally told her, or told the panel that the punishment in this case was life or life without parole, she very clearly rolled her eyes and expressed disapproval of that possibility.  She was very hesitant to say that she could sit in judgment of others.  As you recall, she was one of the two jurors that stated very clearly that they were going to find it very difficult to pass judgment based on their religious and moral beliefs.

She's the one also, Your Honor, that stated that she is single, she can't afford to be here.  She seemed very upset.  She was not willing to answer questions very freely.  She sat with her arms folded most of the time.  It's very clear that she's upset about having to be here.  She said she's a single mother of five children.  I think that's clearly upsetting to her.  And we think that is clearly race-neutral reasons enough for her to be removed from the jury.

*Id.* at 326-27 [264-65].  Graves essentially argued that these reasons were implausible.  Graves

stated, "I didn't see one bit of that, Your Honor, and I'm sitting in the same room."  *Id.* at 327.

Graves further argued,

> There are several people here who have family members in prison.  She also indicated she did not have contact with that family member; that she didn't know anything about the murder.
>
> The fact that she's poor is not race-neutral in Tulsa, Oklahoma.  She did not appear, to me, to not want to be here.  As a matter of fact, she engaged whenever she was asked questions.
>
> This is a systemic removal of African Americans, because I guarantee you now they're going to tell us Ms. Jenkins should be removed because she has difficulty serving on a jury.  It should be difficult to serve on a jury.

Dkt. 10-5, Tr. Trial vol. 2, 327 [265].  Doss responded by offering another reason for excusing

T.M.:

> She also hesitated when I asked her about whether she would hold us to a higher burden, it took her quite a bit of time to answer that question.  And she hesitated very much in agreeing that she would only hold us to the burden that we're required to reach in these cases.  And so I've given Your Honor six or seven reasons that we believe to be race-neutral in this case.

*Id.* at 327-28 [265-66].  The trial court then stated:

> The Court's observation of [T.M.] was that she very much was very hesitant to serve, very hesitant to render judgment, very hesitant to sit on this jury.  She tried yesterday - - she was one of the ones that said they couldn't be here all week because of their situation.  That's not the only reason.  That's just the beginning.  And, quite frankly, I was surprised she was rehabilitated even to the point that she would stay on the jury because of her reluctance to want to serve, want to judge, want to consider.
>
> Also, there was a great - - and the record will reflect this - - there was a great gap in time between questions that she was asked and answers she gave.
>
> . . .
>
> It really seemed like only after extensive prodding was she able to say that she could actually sit and hear this case and make a decision.
>
> So I'm going to deny the Batson challenge on her at this time with an exception.

*Id.* at 327-28 [265-66].

Doss used the State's sixth peremptory challenge to excuse E.F., and Graves raised a third

*Batson* challenge.  Dkt. 10-5, Tr. Trial vol. 2, 329 [267].  Graves noted that E.F. "appears to be of Hispanic heritage," and argued, "He's the third minority.  I believe that half of the State's challenges have been minorities."  *Id.* at 329-30 [267-68].  Doss responded by stating:

> Your Honor, I'd just like the record to reflect he is - - appears to be, I do not know, it's hard to just pass judgment on somebody by their appearance, but he does appear that maybe he could be Hispanic.  He is certainly not African American, which should be noted.
>
> But also what should be noted is throughout the entire - - or very nearly the entire time we were talking to him today, he was jumping his feet up and down, he was rubbing his hands back to together.  It was like he couldn't get out of here soon enough.  So that's clearly a reason enough for you.
>
> Also his age, Your Honor; he's very young.
>
> But I don't believe *Batson* is even appropriate regarding him.  But certainly his physical actions, the way he was acting during the time certainly when I was questioning him, and through most of time that Mr. Graves was questioning him, I notice that as well about him.

*Id.* at 330 [268].  Graves argued these reasons were not plausible because Graves did "not believe the State asked [E.F.] one question," "the fact that [E.F.] may be nervous is not relevant," and "there are a number of young people on every jury."  *Id.*  Graves also pointed out that a *Batson* challenge can be raised even if the prospective juror the State seeks to excuse is not "the same minority as the defendant."  *Id.* at 331 [269].  After hearing both parties' responses and arguments, the trial court denied the *Batson* challenge as to E.F.  *Id.*

Doss used the State's ninth and final peremptory challenge to excuse T.J., and Graves asserted a fourth *Batson* challenge.  Dkt. 10-5, Tr. Trial vol. 2, 332 [270].  Graves argued, "This is absurd.  We had four African Americans left on the jury and we now have one.  And the reasons that they have given can be applied to almost any other juror up there.  This is not a trial by a jury of your peers.  This is not what the Constitution allows, and this is absurd."  *Id.* at 333 [271].  When the trial court asked for a response, Doss proffered:

10

Again, [T.J.], as we've talked about before, she was very, very uncomfortable - - well, I would even use a stronger word than that. She expressed that she was uncomfortable. Initially she said she was not going to be able to pass judgment. We again asked her additional questions and she was finally able to say, Well, it just makes her very uncomfortable. She said it was because of her religion and that her - - and as a Christian, she did not feel like it was her right to judge other people.

She also, again, as we talked about, Your Honor, she also appears to be very young. She also said that she works overnights. And that certainly is a concern when you have a juror that's going to have to be working overnights and then coming in first thing the next morning to listen to evidence in a case like this.

We certainly acknowledge that she is African American. We do want to note for Your Honor, though, that at this time we still have [F.G.], who is African American in Box No. 11. We still have [R.O.], who appears to be Native American in Box 7, and we still have [C.H.], who appears to be Asian and she's also - - in Box 20, and then we also have [J.A.]. Well, I guess [J.A.'s] an alternate, so that wouldn't apply at this point. But there are several minorities represented still on this jury panel.

And, again, those reasons we gave for [T.J.] are race-neutral and we would ask that she be removed.

Dkt. 10-5, Tr. Trial vol. 2, 333-34 [271-72]. After Doss stated these reasons for excusing T.J. and

arguments as to why the trial court should find them plausible, the following colloquy occurred:

[Trial court]:   I would state - - the record will speak for itself as far as the comments that [T.J.] made, but she was very similar to [T.M.]. [T.J.] had an extreme desire not to serve, not wanting to judge. I was again surprised that she was, at some point after much questioning, able to say that she would. But it was obvious to the [c]ourt, she's very close where she's sitting to the [c]ourt's bench where I'm sitting, and I was really shocked that she was not going to be excused for cause because of her commentary, her reluctance to serve.

I understand what Mr. Graves is saying, but I think Ms. Doss did make a good point, we still do have, out of twelve, one African American juror, and there are other minorities as well. So based on Mr. Graves' earlier comments that it could be any minority as far as a *Batson* challenge, there are several still left and - -

Mr. Graves:   I will just state for the record, Your Honor, this is the most blatant violation of *Batson* I have ever seen. And the suggestion, well, you still have one left, we got us having totems along the way.

11

> [Trial court]:   Thank you, Mr. Graves.  We'll show your exception and you still
> have one [peremptory challenge] left.

Dkt. 10-5, Tr. Trial vol. 2, 334-35 [272-73].

After the jury was selected, including alternates, the trial court added the following

observation:

> I do want to state - -  certainly it's not Mr. Graves' opinion, which I greatly respect,
> as I do Ms. Doss's also, but I do think this particular jury of twelve is probably
> about as diverse as a whole, as a body, as I've seen in terms of its representation of
> minorities.  May not have as many African Americans, but it has a great cross-
> section of our community represented; the Asian community to Hispanic
> community to the African American community as well, and two women also being
> represented very well on this jury.  That's just the [c]ourt's observation.  I want that
> on the record.

Dkt. 10-5, Tr. Trial vol. 2, 340 [278].[7]

Graves later made a brief record regarding a challenge for cause that had been denied and

which jurors he may have excused had he not been forced to use a peremptory challenge to remove

a juror for cause.  Dkt. 10-5, Tr. Trial vol. 2, 345 [283].  After making that record, the following

colloquy occurred regarding the State's use of a peremptory challenge to remove T.J.:

> Mr. Graves:   . . . Second, with regard to [T.J.], one of the State's reasons given
> was that she worked nights.  I would simply state that she said that
> - - she gave no indication she would be working nights this week.
> She did have her uniform on yesterday, she did not today, and that
> question was never asked of her by anybody.
>
> [Trial court:]  Darlene, was [T.J.] the one that was asking about parking at the end
> of the day?  Was the parties still here at the time?"  *Id.* at 346 [384].
>
> Ms. Doss:   We were.
>
> [Trial court]:  [T.J.] didn't have any money for parking.  Anyway, your record is

---

[7] The trial court's reference to "two women" appears to be either a misstatement by the
trial court or, perhaps more likely, a typographical error by the court reporter.  When the trial court
called the names of jurors selected to serve, seven female jurors were identified.  Dkt. 10-5, Tr.
Trial vol. 2, 342 [280].  The trial court most likely said, "to women," rather than "two women."

noted.

. . .

Ms. Doss:        . . . But I do want to just make a note in regarding the *Batson* challenges that were mentioned earlier, I do want to just make a note for the record, I'm sure this will be noted through testimony in the case as well, but the victim in this case is also a young African American male.  So I just want to make note that there - -  since we have an African American victim, I just think that needs to be noted in a case regarding the *Batson* challenges.

[Trial court]:   Okay.  Thank you.

Mr. Graves:      And in response to that, I would also state it's been my experience whenever you have an African-American-on-African-American crime, where it's in the process of another crime, allegedly a drug deal, it just exacerbates the problem and makes it more important that you have a jury that accurately reflects the community.

Dkt. 10-5, Tr. Trial vol. 2, 345-47 [ 283-85].

On direct appeal, Bethany argued that the trial court abused its discretion in ruling on his *Batson* challenges.  He argued:  (1)  Doss twice misstated the law regarding *Batson* challenges, and the trial court agreed with at least one misstatement; (2) Doss's proffered reason for striking R.S.—namely, that he had three cousins in prison for robbery—was pretextual because several jurors who were not African-American had friends or family members in prison for crimes similar to those charged in Bethany's case; and (3) even if Doss proffered facially-neutral reasons, the trial court erred in concluding those reasons were plausible.  Dkt. 9-1, Appellant's Br. 17-22.  The OCCA rejected Bethany's *Batson* claim.  The OCCA found "that the prosecutor offered facially plausible, race-neutral reasons for the four peremptory challenges that [Bethany] claimed were racially motivated."  Dkt. 9-3, OCCA Op. 3.  The OCCA noted that the trial court's ruling "is reviewed for an abuse of discretion" and with "deference to [the trial court's] unique ability to consider the demeanor of the prosecutor making the challenge and the prospective juror being challenged."  *Id.*  The OCCA found no abuse of discretion, noting:

Two of the four panelists had relatives in prison for crimes similar to [Bethany's] charges. One of these panelists felt that a life sentence was too harsh, even for murder, and repeatedly expressed her reluctance to pass judgment on another person. A third panelist expressed similar difficulty in being able to pass judgment. A fourth panelist appeared very nervous and uncomfortable with being called to jury duty. [Bethany] claims the prosecutor erroneously stated that *Batson* did not apply until a "pattern" of racially-motivated strikes was established, and did not apply unless the challenged panelist was of the same race as the defendant (one of the challenged panelists was not of the same race as [Bethany]). Nevertheless, the prosecutor offered race-neutral reasons for each strike, and the trial court considered all four under the *Batson* framework.

Dkt. 9-3, OCCA Op. 3-4 n.2.

### C. Analysis and conclusion

In this proceeding, Bethany essentially reasserts the same arguments he made on direct appeal. Dkt. 1, Pet. 5-6. Crow contends that § 2254(d) bars relief as to this claim. Dkt. 9, Resp. 11-21. Having reviewed the record and having evaluated this claim within the constraints imposed by the AEDPA and Supreme Court precedent, the Court agrees with Crow that § 2254(d) bars relief because it was objectively reasonable for the OCCA to determine that "the prosecutor offered race-neutral reasons for each strike," that "the trial court considered all four under the *Batson* framework," and that the trial court's factual findings were not clearly erroneous.

As previously discussed, the *Batson* framework first requires the defendant to establish a prima facie case of discrimination, then requires the prosecutor to give reasons that are facially race-neutral for excusing a juror, then requires the trial court to determine whether the defendant has met his or her burden to show that those reasons are not plausible and, instead, are mere cover for purposeful discrimination. *Collins*, 546 U.S. at 338. Contrary to Bethany's arguments, the prosecutor's misstatements of the law are essentially irrelevant because those misstatements pertain to *Batson*'s first step and the trial court moved on to the second step when it required the prosecutor to provide a reason for excusing each juror that was subject to a *Batson* challenge. *See Hernandez v. New York*, 500 U.S. 352, 359 (1991) ("Once a prosecutor has offered a race-neutral

14

explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."). Further, each of the reasons given by the prosecutor were "comprehensible" and "not inherently discriminatory" and it was therefore not clearly erroneous for the trial court to find, at the second step, that those reasons were race-neutral. *Collins*, 545 U.S. at 338.

The crux of Bethany's argument appears to be that, under all the circumstances, the trial court and the OCCA should have concluded that Bethany met his burden at the third step to show purposeful discrimination. The record in this case, particularly Mr. Graves's statements regarding his perspective on the plausibility of Doss's proffered reasons for using four of the State's peremptory strikes to excuse three prospective jurors who are African-American and one prospective juror who is Hispanic, does give the Court pause. Nevertheless, for the following reasons, the Court cannot say that the OCCA's decision is so lacking in justification that no fairminded jurists would agree with it.

First, two of the prospective jurors, R.S. and T.M., did state they had family or friends in prison for crimes similar to those charged in Bethany's case, namely, robbery and murder, and R.S. stated (1) his uncle had died during "a drug deal gone wrong," and (2) at age 10, he was inside a home that was shot at during a drive-by shooting and he saw his cousins injured by the shooting. Dkt. 10-5, Tr. Trial vol. 2, 125-26 [63-64], 141-43 [79-81], 171-73 [109-11], 189-91 [127-29]. As Bethany argues "about [four] more other jurors who were not minorities" also had friends or family members in prison and "[t]here was no difference from those jurors but the color of their skin." Dkt. 1, Pet. 6. It is true that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise similar nonblack who is permitted to serve, that is evidence

tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005).  But the trial court was in the best position to determine whether the prosecutor singled out R.S. and T.M. based on race rather than because they had family members in prison for robbery and murder.  Moreover, even on the cold transcript it is clear that several prospective jurors who were not identified as minorities and who reported having friends or family members in prison, having family members or friends with criminal histories, or having their own criminal histories also were excused either by the State or by Bethany.  Dkt. 10-5, Tr. Trial vol. 2, 121-200 [59-138], 324-25 [262-63], 328-29 [266-67], 331-32 [269-70], 339 [277]. While the parties' reasons for excusing nonminority jurors are not part of the record, the end result is that many nonminority prospective jurors who, like R.S. and T.M., had family members or friends in prison or some other involvement with the criminal justice system did not serve on Bethany's jury.  Second, when the prosecutor asked all prospective jurors whether anyone "has any religious or moral beliefs that keep them from judging others," only two prospective jurors— T.M. and T.J.—raised their hands and expressed that they were uncomfortable with the idea of passing judgment on another person before, ultimately, expressing that they would be able to follow the law if chosen to serve on the jury.  Dkt. 10-5, Tr. Trial vol. 2, 242-47 [180-85].  And the trial court noted its own observations that both T.M. and T.J. appeared reluctant or hesitant to serve on the jury.  *Id.* at 327-28 [265-66], 334-35 [272-73].  On this record, the Court concludes that § 2254(d) bars relief as to the *Batson* claim and thus denies the petition as to claim one.

## II.    Sufficiency of the evidence (claims two and three)

Bethany claims the State violated his Fourteenth Amendment right to due process by failing to prove, beyond a reasonable doubt, every essential element necessary to establish (1) that he committed attempted robbery with a firearm, the underlying felony the State relied on to charge

him with felony murder, and (2) that he committed the crime of possessing a firearm after former conviction of a felony.  Dkt. 1, Pet. 7-9, 11-12.

### A.      Clearly established law

Under the Due Process Clause of the Fourteenth Amendment, a criminal defendant cannot be convicted of a crime unless the state proves, beyond a reasonable doubt, every essential element of the crime charged.  *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *In re Winship*, 397 U.S. 358, 364 (1970).  *Jackson* provides the clearly established legal rule governing a sufficiency-of-the-evidence claim.  *Johnson v. Mullin*, 505 F.3d 1128, 1134 (10th Cir. 2007).  Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  443 U.S. at 319.  "*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (*per curiam*).

> First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."  And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

*Johnson*, 566 U.S. at 651 (internal citations omitted) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)); *see also id*. at 656 ("[T]he only question under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality.").  In applying the *Jackson* standard on federal habeas review, the federal court looks to state law to determine the substantive elements of the crime.  *Johnson*, 566 U.S. at 655.  "[B]ut the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law."  *Id.*

B.      **Direct appeal**

On direct appeal, Bethany argued the evidence did not support his felony-murder conviction because (1) Bethany's girlfriend, Amy Sessions, acted as an accomplice and her testimony was not sufficiently corroborated or sufficiently credible, and (2) there was not sufficient evidence of an "overt act" to show he attempted to rob Parks.  Dkt. 9-1, Appellant's Br. 22-27. Bethany similarly argued that because Sessions's testimony was not corroborated or credible, the evidence presented at trial did not support his conviction for felony possession of a firearm.  *Id.* at 28.

The OCCA described Bethany's primary argument regarding the sufficiency of the evidence as resting on his claim that "his convictions are infirm because they rest on the uncorroborated testimony of an accomplice, his girlfriend" and found the evidence sufficient to support both convictions, stating:

> [Sessions] testified that she helped him plan the robbery, but only because he beat and threatened her.  The jury was properly instructed that if it found her to be an accomplice, her incriminating testimony had to be corroborated as to some material fact.  *See* 22 O.S. 2011, § 742.  (The jury was also properly instructed that one who only aids the perpetrator out of fear of death or great bodily harm is not an accomplice.)  Even if the jury deemed [Sessions] an accomplice, her testimony was amply corroborated by (1) cell phone logs and text messages between her and the victim, and between her and [Bethany], minutes before the shooting; (2) [Bethany's] threatening letter to [Sessions] after his arrest; (3) [Bethany's] admission to police that he needed money to pay his drug dealer, and that he had planned to rob someone that evening (although he claimed he never went through with the plan); and (4) two disinterested eyewitnesses who saw a man wearing distinctive clothing similar to [Bethany's], leave the scene in the victim's car shortly after the shooting.

Dkt. 9-3, OCCA Op.  4-5.  As to this last point, the OCCA noted:

> Moments after hearing gunshots outside the apartment complex, two of [Bethany's] neighbors saw a man in an orange hoodie get into the victim's car and drive away. Moments later, as Parks lay dying on the lawn, [Bethany]—wearing an orange hoodie—arrived on foot and said, "What happened?  I've been at my mother's house."  The victim's car was found a very short distance away; [Bethany's] mother testified that he was not at her home before the shooting.

18

Dkt. 9-3, OCCA Op. 5 n.3.  On these facts, the OCCA concluded that "[a] rational juror could conclude, beyond a reasonable doubt, that [Bethany], a multiple felon, fatally shot Parks while trying to rob him, and possessed a firearm before and after the robbery attempt." *Id.* at 5.

### C.    Analysis and conclusion

In this proceeding, Bethany first challenges the sufficiency of the evidence to support his conviction for felony murder, claiming that the State failed to prove he committed the underlying felony of attempted robbery with a firearm because the testimony from Sessions and other witnesses was not credible and because there was not sufficient evidence that he attempted to rob Parks.  Dkt. 1, Pet. 7-10.  The jury was instructed that to find Bethany guilty of felony murder, the State had to prove, beyond a reasonable doubt, that:  (1) Parks died, (2) his "death occurred as a result of an act or event which happened in [Bethany's] commission of an attempted robbery with a dangerous weapon, and (3) that Bethany (a) wrongfully, (b) attempted to take, (c) and carry away, (d) personal property, (e) of another, (f) from the person or immediate presence of another, (g) by force or fear, (h) through the use of a loaded firearm.  Dkt. 10-1, O.R. vol. 1, 179 (Instruction No. 29).  As relevant to Bethany's arguments, the jury also was instructed to consider whether Sessions was an accomplice, if so, whether her testimony was sufficiently corroborated as required by state law,[8] to consider several factors in determining whether a witness's testimony is credible, and to consider with care testimony from witnesses who gave previous inconsistent statements.  Dkt. 10-1, O.R. vol. 1, 168-76.  The OCCA found that even if the jury concluded that Sessions

---

[8] Under Okla. Stat. tit. 22, § 742, accomplice testimony must "be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."  However, as Crow states, this state law concern regarding corroboration of accomplice testimony does not implicate federal constitutional concerns.  *See Scrivner v. Tansy*, 68 F.3d 1234, 1239 (10th Cir. 1995) ("The Constitution does not prohibit convictions based primarily on accomplice testimony.").

was an accomplice, her testimony was sufficiently corroborated by other evidence and that the evidence, as a whole, was sufficient for any rational juror to conclude, beyond a reasonable doubt, that Bethany was guilty of attempting to rob Parks before shooting him.  Dkt. 9-3, OCCA Op. 4-5.

This Court has reviewed the trial transcripts and, as Bethany suggests, issues of witness credibility, inconsistent witness statements, and circumstantial evidence were thoroughly explored at trial on direct and cross-examination.  *See* Dkts. 10-6, 10-7, 10-8, generally.  On the record presented, this Court cannot say that the OCCA unreasonably applied clearly established federal law by giving deference to the jury's determinations regarding witness credibility or by concluding, in light of the evidence presented at trial, viewed in the light most favorable to the prosecution, that the jury's credibility determinations and the jury's resolution of conflicting evidence were rational.  The Court therefore denies the petition as to claim two.

Bethany also challenges the sufficiency of the evidence to support his conviction of possessing a firearm after former conviction of a felony.  Dkt. 1, Pet. 11-12.  To convict Bethany of this crime, the jury had to find that the State proved, beyond a reasonable doubt, that Bethany (1) knowingly and willfully, (2) possessed, (3) any pistol, and (4) "was convicted of a felony by the District Court of Muskogee County, State of Oklahoma, on December 9, 2009."  Dkt. 10-1, O.R. 144.  The State presented documentary evidence to support the fourth element but relied primarily on testimony from Sessions and circumstantial evidence to establish the other elements.  Dkt. 10-9, Tr. Trial (Second and Third Stages), 16-18.  Applying *Jackson*'s standard, the OCCA found this evidence sufficient to support the conviction.  And, again, Bethany's only argument as to why the OCCA's decision is objectively unreasonable primarily rests on his assertion that Sessions was not a credible witness.  Dkt. 1, Pet. 11-12.  As previously discussed, the jury resolved

credibility issues and conflicting evidence in the State's favor, and it was objectively reasonable for the OCCA to determine that the jury's verdict was rational in light of the evidence presented. Bethany's argument does not suffice to overcome the double deference that applies to *Jackson* claims raised in a federal habeas petition.  The Court therefore denies the petition as to claim three.

## III.     Incomplete jury instructions (claim four)

Next, Bethany claims the trial court violated his Fourteenth Amendment right to due process and a fair trial by failing to adequately instruct the jury regarding the definition of "attempt," as it applied to the underlying felony of attempted robbery with a firearm which was a necessary element to support his felony-murder conviction.  Dkt. 1, Pet. 14-15.

### A.     Clearly established federal law

"Claims of erroneous jury instructions can justify setting aside a state conviction on habeas review only if 'the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial in the constitutional sense, or is otherwise constitutionally objectionable as, for example, by transgressing the constitutionally rooted presumption of innocence.'"  *Dockins v. Hines*, 374 F.3d 935, 938-39 (10th Cir. 2004) (quoting *Brinlee v. Crisp*, 608 F.2d 839, 854 (10th Cir. 1979)).  Thus, "unless the [C]onstitution mandates a jury instruction be given, a habeas petitioner must show that, in the context of the entire trial, the error in the instruction was so fundamentally unfair as to deny the petitioner due process."  *Tiger v. Workman*, 445 F.3d 1265, 1267 (10th Cir. 2006).

### B.     Analysis and conclusion

The trial court twice instructed the jury on the elements of attempted robbery with a firearm.  Dkt. 10-1, O.R. vol. 1, 179, 184.  The trial court also instructed the jury that "[a] person is in the commission of attempted robbery with a dangerous weapon when he is performing an act

which is an inseparable part of or performing an act which is necessary in order to complete the course of conduct constituting or fleeing from the immediate scene of an attempted robbery with a dangerous weapon." *Id.* at 180 (Instruction No. 30).

On direct appeal, Bethany argued that the trial court should have defined "attempt" by giving additional jury instructions, specifically, Oklahoma Uniform Jury Instructions – Criminal (OUJI-CR) (2nd) Nos. 2-10 through 2-15. Dkt. 9-3, OCCA Op. 5. The OCCA reviewed Bethany's claim for plain error, noting that trial counsel did not request these instructions or object to their omission. *Id.* Applying the reasoning from its prior decision in *Mitchell v. State*, 387 P.3d 934 (Okla. Crim. App. 2016), the OCCA found "no error of any kind," reasoning that "the charge of Attempted Robbery with a Dangerous Weapon was not brought under Oklahoma's general attempt statute (21 O.S. 2011, § 44) but under the armed-robbery statute (21 O.S. 2011, § 801)." Dkt. 9-3, OCCA Op. 5.

In this proceeding, Bethany simply reasserts that the instructions identified by appellate counsel should have been given and argues that he was prejudiced by their omission. Dkt. 1, Pet. 14-15. As Crow contends, this particular issue regarding whether the jury should have been given general "attempt" instructions in accordance with state law, and the OCCA's resolution of this claim on the basis of *Mitchell*, does not present a cognizable habeas claim. Dkt. 9, Resp. 37-41. However, even assuming Bethany's arguments are reasonably construed as sufficient to allege a violation of his constitutional right to due process, the Court finds no basis to grant federal habeas relief. To obtain relief, Bethany must show that the omission of the allegedly necessary "attempt" instructions rendered his trial fundamentally unfair, in the context of the entire trial. *Tiger*, 445 F.3d at 1267. But here, Bethany's trial counsel did not object to the omitted instructions, the OCCA determined, contrary to Bethany's position, that the omitted instructions need not be given

because Bethany was not charged under general statutes prohibiting attempted crimes, and the instructions as a whole apprised the jury of applicable state law.  Under these circumstances, the Court cannot say that the omission of the unrequested instructions deprived Bethany of a fundamentally fair trial.  *See, e.g.*, *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) ("Counsel's failure to object . . . while not dispositive, is also relevant to a fundamental fairness assessment."); *Maes v. Thomas*, 46 F.3d 979, 984 (10th Cir. 1995) (noting that omitted instructions are "less likely to be prejudicial than a misstatement of the law").  The Court thus denies the petition as to claim four.

## IV.    Double punishment (claim five)

Bethany claims his convictions of first-degree felony murder and felonious possession of a firearm violate Oklahoma's statutory prohibition against double punishment.  Dkt. 1, Pet'r's Br. 16-17.  Bethany raised this claim on direct appeal, and the OCCA rejected it, reasoning, under state law, that because "the two convictions are supported by independent facts, there is no double-punishment problem."  Dkt. 9-3, OCCA Op. 6.  As Crow contends, claim five does not present a cognizable habeas claim because it alleges only a violation of state law, specifically, Okla. Stat. tit. 21, § 11.  *See, e.g.*, *Spradling v. Addison*, 367 F. App'x 938, 940 (10th Cir. 2010) (unpublished)[9] ("To the extent Mr. Spradling argues that his conviction violates the prohibition on multiple punishments found at Okla. Stat. tit. 21, § 11, the state court's interpretation of its own laws is not a cognizable claim for federal habeas relief."); *Davis v. Reynolds*, 890 F.2d 1105, 1109 n.3 (10th Cir. 1989) (noting that only federal constitutional issues were properly before the court in a habeas case and that "[a]lternative state claims, whether grounded in state statutes or the State

---

[9] The Court cites this unpublished decision, and other unpublished decisions herein, as persuasive authority.  Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

Constitution, are not cognizable under 28 U.S.C. § 2254(a)").  Because this claim alleges only an error of state law, the Court denies the petition as to claim five.

## V.      Ineffective assistance of trial counsel (claim six)

Bethany claims he was deprived of his right to the effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments, because trial counsel:  (1) failed to object to the incomplete jury instructions that did not define "attempt" under Oklahoma law, and (2) failed to object to Bethany being convicted of and sentenced for two crimes—first-degree felony murder and felonious possession of a firearm—"knowing it was double punishment" in violation of Oklahoma law.  Dkt. 1, Pet. 19.

### A.      Clearly established federal law

The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel.  U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  Under *Strickland*, a defendant alleging ineffective assistance of counsel must show deficient performance and resulting prejudice.  466 U.S. at 692.  The *Strickland* standard is "highly deferential" because a reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  Significantly, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  *Id.* at 691.  Thus, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution."  *Id.* at 692.  To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

24

On federal habeas review, a court must apply added deference when reviewing a state court's decision on a *Strickland* claim. *See Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (stating, "We have recognized the special importance of the AEDPA framework in cases involving *Strickland* claims," and concluding that the "the Court of Appeals erred in ordering issuance of a writ of habeas corpus despite ample room for reasonable disagreement about the prisoner's ineffective-assistance-of-counsel claim" and "[i]n doing so . . . clearly violated [the Supreme] Court's AEDPA jurisprudence"); *Richter*, 562 U.S. at 105 ("The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." (internal citations omitted)).

### B.     Analysis and conclusion

Applying *Strickland*, the OCCA rejected Bethany's claim that trial counsel was ineffective for (1) failing to object to allegedly inadequate instructions defining "attempt," and (2) failing to raise a double-punishment argument as to his convictions of counts one and four. Dkt. 9-3, OCCA Op. 6-7. The OCCA reasoned that it had previously determined that neither the jury-instruction claim nor the double-punishment claim had merit and thus concluded that Bethany "was not prejudiced by trial counsel's failure to raise them." *Id.* at 7.

Because the OCCA applied *Strickland*, the only question for this Court is whether the OCCA's application of *Strickland* to the facts of this case is objectively reasonable. And, on the record presented, the Court finds that it is. It is clear from the record that the prosecutors and defense attorneys diligently prepared the jury instructions. Dkt. 10-8, Tr. Trial vol. 5, 991-92 [119-20]. And, in light of the OCCA's decision in *Mitchell*, the trial court likely would have overruled any objection trial counsel might have raised to the omission of the "attempt" instructions identified by appellate counsel. Dkt. 9-3, OCCA Op. 5. Trial counsel's failure to object to the

omitted instructions was neither deficient nor prejudicial.   Likewise, it was not deficient or prejudicial for trial counsel to allege a violation of Oklahoma's double-punishment statute when, as the OCCA reasoned, the two crimes at issue were "supported by independent facts" and did not result in double punishment.  *Id.* at 6.  Because the OCCA reasonably applied *Strickland* to the facts of this case, § 2254(d) bars relief and the Court denies the petition as to claim six.

## VI.   Excessive sentence (claim seven)

In his seventh and final claim, Bethany contends the trial court imposed an excessive sentence by ordering that the two life sentences, as to counts one and four, be served consecutively. Dkt. 1, Pet. 21-23.  The OCCA rejected this claim on direct appeal.  The OCCA reasoned, "Given the facts of the case and [Bethany's] criminal history, we cannot say the sentences are shocking to the conscience, or that the trial court's order that they be served consecutively was an abuse of discretion."  Dkt. 9-3, OCCA Op. 7.

Crow contends that claim seven does not present a cognizable federal habeas claim.  Dkt. 9, Resp. 55-57.  The Court agrees.  On federal habeas review, courts afford "wide discretion to the state trial court's sentencing decision, and challenges to that decision are not generally constitutionally cognizable, unless it is shown the sentence imposed is outside the statutory limits or unauthorized by law."  *Dennis v. Poppel*, 222 F.3d 1245, 1258 (10th Cir. 2000).  Therefore, a habeas court's "review of a sentence ends once [it] determine[s] the sentence is within the limitation set by statute."  *Id.*  Bethany does not contend that state law does not authorize a life sentence for each of his crimes of conviction.  Dkt. 1, Pet. 21-23.  Instead, he claims only that the trial court's decision to run those sentences consecutively resulted in excessive sentences.  *Id.*  But Oklahoma law provides that a trial court has the discretion to order that sentences run consecutively or concurrently.  Okla. Stat. tit. 22, § 976.  And "[i]t is well-established that courts

26

may constitutionally impose consecutive sentences for completely distinct and separate offenses." *Woodberry v. Hannigan*, 37 F. App'x 404, 406 (10th Cir. 2002) (unpublished).  Under the facts of this case, Bethany's challenge to his sentences does not implicate federal law.  The Court thus denies the petition as to claim seven.

### CONCLUSION

Based on the foregoing analysis, the Court concludes that Bethany has not shown that he is in custody in violation of the Constitution or other federal law.  The Court therefore denies his petition for a writ of habeas corpus.  The Court further concludes that reasonable jurists would not find this Court's assessment of Bethany's claims debatable or wrong, and thus declines to issue a certificate of appealability.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. The petition for writ of habeas corpus (Dkt. 1) is **denied**.

2. A certificate of appealability is **denied**.

3. A separate judgment shall be entered in this matter.

**DATED** this 6th day of September 2022.

TERENCE C. KERN
United States District Judge